# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

SHIRLEY KATZ,

        Plaintiff,

    v.

NORTHWEST ORTHOPAEDICS AND
SPORTS MEDICINE LTD., et al.,

    Defendants.

No. 18 CV 4515

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

Plaintiff Shirley Katz worked as an occupational therapist for defendant Northwest Orthopaedics and Sports Medicine for nearly 20 years. When her husband was diagnosed with cancer, Katz took a leave of absence to care for him. Her managers at the clinic told her to take as much time as she needed to be with her family. According to Katz, when she tried to return to work, the clinic offered her only a position as an independent contractor. Katz alleges that Northwest and some of its owners and employees violated the Family and Medical Leave Act by denying her reinstatement to her original job. She also brings state-law claims, including breach of contract, promissory estoppel, tortious interference with contract, fraudulent misrepresentation, and intentional infliction of emotional distress. Northwest moves for summary judgment on all claims. For the reasons discussed below, the motion is granted in part, denied in part.

## I. Legal Standards

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). I construe all facts and draw all inferences in favor of the nonmoving party. *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 377–78 (7th Cir. 2020).

## II. Background

Katz worked as an occupational therapist for Northwest Orthopaedics. [51] ¶ 8; [56] ¶ 1.[1] Northwest provided orthopedic surgery, physical therapy, and occupational therapy to patients, with an emphasis on sports medicine. [51] ¶ 2. Alan McCall, Brian McCall, Gregory Fahrenbach, Richard Hayek, Christopher Mahr, and Todd Rimington, all orthopedic surgeons, were Northwest's shareholders. [51] ¶ 3. Chris Volanti was the clinic's director of operations, and Regina Roderick was the clinic manager. [51] ¶¶ 3, 5. Roderick oversaw the physical therapists, occupational therapists, therapist aides, billing department, and front office staff, as well as

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except in the case of citations to depositions, which use the deposition transcript's original page number. The facts are largely taken from Katz's response to Northwest's Rule 56.1 statement, [51], and Northwest's response to Katz's statement of additional facts, [56], where both the asserted fact and the opposing party's response are set forth in one document. I disregard any arguments raised in the Local Rule 56.1 statements, additional facts included in responses or replies, and statements that are unsupported by admissible evidence (or where a party fails to follow Local Rule 56.1's direction to cite to supporting material in the record). Only facts that are properly controverted will be considered disputed.

provided physical therapy to patients. [51] ¶¶ 3, 5; [56] ¶ 4. She reported to Volanti. [51] ¶ 5.

The clinic's shareholders held regular meetings to discuss clinic business. [51] ¶ 6. All shareholders had equal votes. [51] ¶ 4. Not all of the shareholders attended these meetings; Alan McCall was semi-retired, did not have any administrative responsibilities, rarely attended shareholders' meetings, and was not involved in any personnel decisions regarding Katz. [51] ¶ 7. Likewise, Fahrenbach worked only part-time due to health issues; he also rarely attended shareholders' meetings. [51] ¶ 7. Volanti typically attended the meetings and implemented decisions the shareholders made about Northwest's staff or independent contractors. [51] ¶ 6. Roderick did not attend the meetings. [51] ¶ 6.

In late 1997, Northwest hired Katz as a full-time occupational therapist, and she began working there in 1998. [51] ¶ 8; [56] ¶ 1.[2] She did not remember ever signing an employment contract; she was hired as an at-will employee. [51] ¶ 8. Katz received a copy of Northwest's employee manual, which stated that the clinic "reserves the right to revise or terminate any or all policies, procedures or benefits in whole or in part with or without notice at any time." [51] ¶ 9. The handbook stated that all employment was at-will, and that the manual itself was not an employment contract. [51] ¶ 9. The manual also included an FMLA policy, which mirrored the

---

[2] Northwest disputes Katz's assertion that she worked full-time at the outset because Katz later began dialing back her hours. This fact is not properly controverted; Northwest's own statement of facts asserts that Katz was hired to be a full-time employee. [51] ¶ 8.

3

language in the federal statute. [51] ¶ 9. Katz did not report to the physician shareholders. [51] ¶ 8.

When Katz started at Northwest, she worked 7 a.m. to 3:30 p.m. Monday through Friday. [51] ¶ 8; [56] ¶ 1. When she had to miss a day, a part-time contractor typically covered her shifts. [56] ¶ 1. Later, in 2013, Northwest and Katz agreed that Katz would work 67 hours during every two-week pay period, from 8:30 a.m. to 6:30 p.m. on Mondays and Wednesdays, and from 8:30 a.m. to 3:15 p.m. on Tuesdays and Thursdays. [51] ¶¶ 10, 52.[3] In 2014, 2015, 2016, and 2017, Katz averaged 55.94, 51.07, 57, and 58 hours, respectively, per two-week pay period. [51] ¶ 11. The parties dispute whether Katz was a full-time employee at that point or, as the clinic asserts, she had converted herself into a part-time employee. [51] ¶ 12. Brian McCall and Volanti both testified that Katz was "technically" a full-time employee, but she did not work full-time hours. [50-1] at 45, ¶¶ 13, 14; [50-2] at 7, ¶ 12. Brian McCall further testified that Katz was "never a part-time employee," but was "always a full-time employee." [54-11] 65:15–16.

Generally, the doctors at Northwest thought Katz had a good rapport with the patients, a good work ethic, and considered themselves to have a friendly relationship with her. [56] ¶ 2. But the clinic's management was unhappy that Katz was not working the hours she was supposed to work. [51] ¶ 12. In April 2017, Katz requested a salary increase in writing. [51] ¶ 13.

---

[3] Katz disputes that Northwest asked her to work 67 hours per two-week period in 2013, because, in 2012, the clinic asked her to work 33 hours a week. [51] ¶ 10. What the clinic asked for in 2012 does not controvert its 2013 request. The fact is admitted.

Later that month, at a shareholders' meeting, the clinic's shareholders decided to terminate Katz, based both on her request for more pay and her falling short on her hours. [51] ¶ 13.[4] At that point, Katz had not told Northwest's management that her husband was ill, or that she needed to take time off to care for him. [51] ¶ 14.

Northwest's managers decided to hire Katz's replacement before telling Katz that they were firing her. [51] ¶ 15. In May, Volanti and Roderick hired a staffing company to search for a replacement, and reached an agreement with that company to hire Dan Gabel on a temporary basis for 13 weeks; after that time, the clinic could hire Gabel as a full-time occupational therapist if it wanted to. [51] ¶¶ 16–17. Gabel was scheduled to start in July. [51] ¶ 18.

Volanti scheduled a meeting on June 8 to tell Katz that she was being fired. [51] ¶ 18.[5] On June 7, Katz's husband was diagnosed with metastatic melanoma. [56] ¶ 9. At the meeting the next day, before Volanti could tell Katz about the termination decision, Katz told Volanti that her husband had been diagnosed with cancer. [51] ¶ 18. Volanti opted not to tell Katz that she was being fired, and instead told her to take any time off that she needed, and that she could work if she wanted to. [51] ¶ 20. The clinic decided not to fire Katz, but did not withdraw its employment offer to

---

[4] Katz disputes this fact, because she says the doctors offered conflicting testimony about why they decided to fire Katz. [51] ¶ 13. But Northwest asserts that the shareholders based their decision to fire Katz both on her hours and her request for higher pay. The fact is not properly disputed.

[5] Katz disputes that Volanti scheduled a meeting to tell her about the termination decision, because Volanti did not tell Katz the purpose of the meeting. But that Katz didn't know the reason for the meeting does not controvert the fact that Volanti scheduled it for that purpose. Volanti would not have told Katz the purpose of the meeting beforehand. The fact is admitted.

Gabel. [51] ¶ 21; [56] ¶ 12. Katz used a few paid-time-off days in the following weeks to bring her husband to doctor's appointments; she worked four days the week of June 19. [56] ¶ 9. Katz took a leave of absence to care for her husband beginning June 22. [51] ¶ 22; [56] ¶ 9. Roderick told Katz that Gabel would cover for Katz while she was on leave. [51] ¶¶ 22, 26. Although she was on unpaid leave, Katz had enough paid time off accrued to last until sometime in July, so she received a regular paycheck. [51] ¶ 28. After that, Katz continued to receive her normal salary until mid-September. [51] ¶ 28.

In early August, Roderick asked Katz to access the required FMLA paperwork electronically and to backdate the start date of her leave to June 12. [56] ¶ 10.[6] When Roderick later learned Katz could not access the forms electronically, she emailed her the forms. [56] ¶ 10. The clinic never gave Katz an FMLA notice of eligibility, and no one told her how many weeks of leave she was entitled to. [56] ¶ 10. Katz ultimately submitted an FMLA certification. [51] ¶ 22.

While Katz was on leave, Northwest began to restructure. [51] ¶ 35. Northwest switched its employee health insurance company from Blue Cross Blue Shield to Aetna. [51] ¶ 31. To comply with the Aetna plan, Northwest cut its workforce to fewer than 50 employees, expanded the clinic's hours to accommodate patients before and after the typical workday, and eliminated all part-time positions. [51] ¶ 31–34; [56]

---

[6] There is some dispute about when Katz first learned that the FMLA would apply to her leave. Katz says no one had ever mentioned the FMLA to her before Roderick's August email. The clinic asserts, based on Volanti's testimony, that Volanti had told Katz on June 8 to access her FMLA forms through Northwest's payroll service. [56] ¶ 10; [56-6] 170:20–23.

¶ [3]. No one told Katz during her leave that the clinic had restructured, that it changed its hours, or that it intended to eliminate part-time employees. [56] ¶ 27.

Northwest gave part-time employees the option to either work full-time hours or to work as independent contractors on an hourly basis. [51] ¶¶ 34–36.[7] The clinic continued to hire part-time employees during the summer and fall of 2017, although those employees later converted to full-time employees. [51] ¶¶ 35–36; [56] ¶ 29. At least two therapists or therapist aides transitioned into independent contractors. [51] ¶¶ 35–36.

In July, Gabel began working as a full-time occupational therapist. [51] ¶ 37. He worked Monday through Friday, including evening hours, amounting to about 80 hours every two weeks. [51] ¶ 37. A month later, Gabel announced he was moving to Montana. [51] ¶ 38. At that point, Katz was still caring for her husband and she had not set a date to return to work. [51] ¶ 38. Volanti and Roderick felt that the clinic needed another full-time occupational therapist, regardless of when Katz returned to Northwest, and began searching for a replacement. [51] ¶ 39–40; [56] ¶ [13].[8] Tina

---

[7] Katz says that not all part-time employees were eliminated by September 2017, when she returned to work. But that is not responsive to Northwest's asserted fact; Northwest does not assert that all part-time employees were gone by September 2017. The only timeline it asserts is "[t]hrough the restructure." [51] ¶ 34. The fact is admitted.

[8] Katz disputes that the clinic needed another therapist because Volanti and Roderick "should have expected" that Katz would return to work. But what they should have expected does not properly controvert that Volanti and Roderick felt the clinic could hire another therapist. [51] ¶ 39. Katz also disputes that the clinic intended the new hire to replace Gabel, rather than Katz, but she cites to no evidence in the record that Northwest hired Bailey to replace Katz rather than Gabel. [51] ¶ 40.

Bailey responded to the clinic's job posting, and in late August, Volanti interviewed Bailey. [51] ¶¶ 41–42; [56] ¶ 14.

Katz's husband died shortly thereafter, leaving her the sole caretaker for her three children. [51] ¶ 29; [56] ¶ 11. Alan and Brian McCall attended the memorial service for Katz's husband. [56] ¶ 31. At her home during shiva, Katz told Brian McCall that she wanted to return to work in about a month, and McCall said that was fine, and that the work would be there when she was ready to return. [51] ¶ 25; [56] ¶ 11.

Other than that conversation with McCall, none of the doctors spoke to Katz during her absence about any issues with her leave or her return. [51] ¶ 24. Northwest's management assumed that Katz would return to work, and Volanti shared any updates she had with the physician shareholders during Katz's leave. [51] ¶ 48; [56] ¶ 13. No one from the clinic told Katz that she had to return to work by a certain date following the death of her husband. [51] ¶ 30.

On September 6, Katz asked Volanti and Roderick about enrolling in the clinic's health insurance. [51] ¶ 49. That same day, Katz told Roderick that she hoped to return to work somewhere around October 1. [51] ¶ 50. On September 11, Volanti responded to Katz's email about health insurance, saying she was eligible for coverage and instructing her on how to enroll. [51] ¶ 49. The next day, Katz told Volanti that she planned to return to work on October 2. [51] ¶ 50. Around that same time, Katz told Volanti and Roderick over email that she would initially need to work Monday through Friday, 8:30 a.m. to 3 p.m. [51] ¶¶ 51–52.

On September 18, Bailey came to the clinic to shadow one of the doctors. [51] ¶¶ 41–42. At a shareholders' meeting later that day, Volanti requested approval to hire Bailey, and the doctors present approved the hire. [51] ¶¶ 41, 43–44. They also discussed Katz's insurance eligibility and proposed schedule. [51] ¶¶ 49, 53. It was the first time the shareholders discussed Katz's return. [51] ¶ 53. The doctors took Katz's proposed schedule to be that of a part-time employee. [51] ¶ 54. Since the clinic had eliminated part-time positions as part of the restructure, the shareholders concluded that Katz could return either as a full-time employee or on a contract basis. [51] ¶¶ 54–56.[9] The shareholders told Volanti to offer Katz those two options. [51] ¶ 57. They did not discuss what hours Katz would work as an independent contractor; she could have worked whatever hours she wanted. [51] ¶ 61.

Within a few days of that shareholders' meeting, Roderick and Volanti offered Bailey a position as an occupational therapist, and Bailey accepted. [51] ¶ 44. She was scheduled to start work in mid-October; her hours were 7 a.m. to 3 p.m. on Tuesday, Thursday, and Friday, and 11:30 a.m. to 7:30 p.m. on Mondays and Wednesdays. [51] ¶¶ 44–46. The parties dispute Bailey's start date; Katz asserts that Bailey was hired earlier than October, based on an insurance billing report that listed Bailey as an employee in August 2017. [51] ¶ 44. Volanti explained that an "inappropriate bill" had listed Gabel's hours under Bailey's name. Gabel's hours were

---

[9] Katz's assertion that she "should have been offered" the same job she had before her leave is an argument, and it does not controvert Northwest's representation of what happened at the meeting. [56] ¶ 55.

9

"billed out under Tina Bailey's name. Tina Bailey hadn't started yet." [54-4] 70:1–71:4.

No one from the clinic told Bailey that Northwest had another occupational therapist on staff. [56] ¶ 18. Likewise, no one told Katz during her leave that Northwest had been searching for another occupational therapist, or that it had hired Bailey. [56] ¶ 17. During Katz's tenure at Northwest, the clinic had never employed more than one occupational therapist, other than when incoming and outgoing occupational therapists overlapped. [56] ¶ 6. The clinic did not anticipate any increase in patients in 2017 that would require employing two occupational therapists. [56] ¶ 7.

On September 25, 2017, Volanti, Roderick, and Katz met in person to discuss Katz's options for her return. [51] ¶ 57; [56] ¶ 20. The parties dispute what happened at that meeting. According to Northwest, Volanti and Roderick asked Katz if she was willing to work full-time hours. [51] ¶ 58. Katz did not answer, and instead suggested that two part-time employees could cover the full-time hours at the clinic. [51] ¶¶ 58–59. Volanti responded that the clinic was no longer employing part-time therapists. [51] ¶ 58. Volanti then brought up a contract position, and Katz walked out of the meeting before they could discuss the specifics. [51] ¶ 59. Katz's notes from the meeting indicate that they discussed health insurance at some point, which would not have come up in the context of contract employment. [51] ¶ 58.

According to Katz, Volanti never presented the option of returning to work full-time; she said that Katz could not return to the hours she was working before her

leave, and offered only the contract position. [51] ¶ 58; [56] ¶¶ 20, 23. Katz nevertheless told Volanti that she would work any hours the clinic required to keep her full-time job. [51] ¶ 59. According to Katz, Volanti said that the clinic had already hired Bailey full-time to replace her, and the contract position was available to handle Bailey's overflow patients. [51] ¶ 59; [56] ¶ 22. No one ever asked Katz if she would be willing to work the clinic's expanded hours under the restructure, or offered her the schedule that Bailey was working. [56] ¶¶ 3, 19.[10]

After the meeting, Volanti emailed Katz a written proposal for her to work as an independent contractor. [51] ¶ 60; [56] ¶ 24. The email did not mention any opportunity to work full-time. [56] ¶ 24. The parties disagree about whether Katz responded to that email. According to Katz, she replied to both Volanti and Roderick the next day, saying she was "considering options that you had given me yesterday" and reiterating her request to work full-time. [51] ¶¶ 61–62. Volanti and Roderick never received the email. [51] ¶¶ 63–64. Other than the disputed email, Katz emailed Roderick twice over the next two days because she was having problems logging into her work email, but did not otherwise text or call Roderick, and Volanti did not hear anything from Katz until October 6. [51] ¶¶ 63–64. On that day, Volanti emailed Katz to follow up on the independent contractor offer, and Katz declined the offer. [51] ¶ 62. Volanti told Katz that the clinic would send her personal belongings. [56] ¶ 30. According to Northwest, if Katz had communicated a desire to return to the clinic as

---

[10] Northwest disputes this fact by asserting that Bailey and Gabel worked early morning and evening hours, but that is not responsive to Katz's assertion that she was never asked to work those hours.

a full-time employee, she would have been given a full-time position. [51] ¶ 65. Katz disputes this, on the basis that she did communicate such a desire in her September 26 email. [51] ¶ 65.

The parties dispute what hours came with the contract position; according to the clinic, the doctors believed Katz could have worked whatever hours she wanted as a contractor. [51] ¶ 61. Katz asserts, based on Roderick's testimony, that the contract position did not provide a set number of hours or a reliable schedule; the clinic called in independent contractors on an as-needed basis. [56] ¶ 21; [54-7] 278:4–12. Katz felt she had no choice but to reject the independent contractor position, because she needed more reliable hours and health insurance. [56] ¶ 26.[11] If she knew that her job would not be waiting for her when she returned, she would have offered to return to work earlier or started looking for a new job sooner. [56] ¶ 28.

After the meeting with Volanti and Roderick, none of the doctors called Katz to find out why she was not returning to work. [56] ¶ 31. Likewise, Katz did not reach out to any of the doctors about the employment options that Volanti had presented to her. [51] ¶¶ 66–68, 70. In October, Katz sent two emails to Rimington requesting a letter of recommendation. [51] ¶ 69. She did not ask to return to her full-time position in either email. [51] ¶ 69.

On December 7, 2017, Brian McCall called Katz. [51] ¶ 71. The parties dispute what McCall said; according to Northwest, McCall told Katz that her job had "always

---

[11] Northwest disputes this fact by asserting that it offered Katz an opportunity to work full-time, which is unresponsive to the asserted fact that Katz felt she could not accept a contract position.

been there for her," but Katz denies that McCall ever said that. [51] ¶ 71. Likewise, Northwest says that, if Katz had told any of the doctors that she wanted to work full-time, she would have been given a full-time position. [51] ¶ 72. Katz asserts that she told McCall that she had offered to work full-time, and would still return full-time, but McCall did not invite her back. [51] ¶ 72.

After Katz left Northwest, Katz became depressed and anxious, gained weight, and had trouble sleeping. [56] ¶ 33. She saw a therapist and was prescribed anti-depressants to cope with losing her job after losing her husband. [56] ¶ 33. She has never been diagnosed with any psychiatric or psychological condition. [51] ¶ 74.

In mid-December, Athletico offered Katz a job. [51] ¶ 75. She asked if she could begin in February, and Athletico agreed; her schedule there was 8:30 a.m. to 2:30 p.m. [51] ¶ 75. Bailey resigned from Northwest in December 2018, and the clinic operated without any occupational therapists for several months. [56] ¶ 8.

## III. Analysis

Katz brings six claims against the clinic, Alan McCall, Brian McCall, Rimington, Fahrenbach, Hayek, Mahr, Volanti, and Roderick. She alleges that the clinic, Roderick, Volanti, and the individual doctors violated the FMLA by not reinstating her to her job following her leave, and by not timely notifying her that her leave fell under the FMLA. She brings claims of breach of contract against the clinic, promissory estoppel against all defendants, tortious interference with contract against all defendants, intentional infliction of emotional distress against all defendants, and fraudulent misrepresentation against the clinic, Brian McCall, Roderick, and Volanti. Northwest moves for summary judgment on all claims.

13

### A.  FMLA Interference

The FMLA provides employees up to 12 weeks of unpaid leave to, among other things, care for a family member who has a serious health condition. 29 U.S.C. §§ 2612(a)(1)(C); *Moldenhauer v. Tazewell-Pekin Consol. Commc'n's Ctr.*, 536 F.3d 640, 643 (7th Cir. 2008). An employer must not "interfere with, restrain, or deny the exercise of or the attempt to exercise" any FMLA rights. 29 U.S.C. § 2615(a)(1).

To survive summary judgment on an FMLA interference claim, Katz must show that (1) she was eligible for FMLA protections; (2) her employer was covered by the FMLA; (3) she was entitled to take leave under the FMLA; (4) she provided sufficient notice of her intent to take leave; and (5) her employer denied her FMLA benefits to which she was entitled. *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 223 (7th Cir. 2015). The parties only dispute the last element. [49] at 18.

"[N]o finding of ill intent is required" to prove FMLA interference; an employee need only show that her employer deprived her of an FMLA entitlement. *Burnett v. LFW Inc.*, 472 F.3d 471, 477 (7th Cir. 2006); *see also Shaffer v. Am. Med. Ass'n*, 662 F.3d 439, 443 (7th Cir. 2011).

Katz argues that Northwest interfered with two of her FMLA rights: the right to be reinstated to her original job or an equivalent position, and the right to receive timely notice that her leave qualified as FMLA leave. The clinic moves for summary judgment on both theories. In the alternative, it argues that summary judgment should be granted to the individual defendants.

### 1. *Right to Reinstatement*

The FMLA requires an employer to return an employee who is on leave to the same position, or an equivalent one with equivalent terms of employment. *Curtis*, 807 F.3d at 223–24; *Makowski v. SmithAmundsen LLC*, 662 F.3d 818, 825 (7th Cir. 2011) (citing 29 U.S.C. § 2612). The right to reinstatement is not absolute. *Goelzer v. Sheboygan Cty.*, 604 F.3d 987, 993 (7th Cir. 2010). If an employee "would have been fired regardless of whether she took the leave," then she is not entitled to return to her former position. *Id.*; *see also Shaffer*, 662 F.3d at 443. Put differently, an employer may refuse to restore an employee to her former position if doing so would "confer a 'right, benefit, or position of employment'" that the employee would not have been entitled to if she had never left the office. *Goelzer*, 604 F.3d at 993 (quoting *Kohls v. Beverly Enters. Wisc., Inc.*, 259 F.3d 799, 805 (7th Cir. 2001)).

When an employer presents evidence that its employee was not entitled to her position regardless of taking leave, the employee must "overcome the employer's assertion" and raise a genuine issue of material fact that she was entitled to be reinstated. *Simpson v. Office of Chief Judge of Circuit Ct. of Will Cty.*, 559 F.3d 706, 712–13 (7th Cir. 2009) (quoting *Kohls*, 259 F.3d at 804). The question then becomes whether the employee was not reinstated "because she exercised her right to take FMLA leave." *Goelzer*, 604 F.3d at 993; *Simpson*, 559 F.3d at 713 (plaintiff must show that decision not to reinstate her was "illegally motivated by [her] choice to take leave." (quoting *Phelan v. City of Chicago*, 347 F.3d 679, 683 (7th Cir. 2003))).

15

The clinic argues that Katz was a part-time worker, and it eliminated part-time positions while Katz was on leave, so Katz was not entitled to be reinstated. In other words, even if Katz had not taken leave, she would have been offered the same independent contractor position. But whether Katz was full or part-time before her leave is a disputed question of fact. It is undisputed that the clinic hired Katz in 1997 as a full-time therapist. Later, in 2013, Northwest and Katz agreed that Katz would work 67 hours for every two-week pay period. But for the next four years, Katz averaged between 51 and 58 hours every two weeks, below the 67 she had agreed to. So, the clinic says, Katz converted herself into a part-time employee. But the clinic points to no evidence that anyone at the clinic considered Katz a part-time employee, other than the fact that she typically fell short of working 67 hours. And as Katz points out, Brian McCall testified that Katz was "always a full-time employee."

If Katz was a part-time worker before her leave, she may not have had a right to reinstatement because the clinic eliminated all part-time positions while Katz was gone. In that case, Katz would have to overcome the clinic's assertion that it did not return her to her old job because her part-time position no longer existed. On this record, however, a jury could find that Katz was always categorized as a full-time employee, so she was entitled to that position when she returned.[12] The clinic is not entitled to summary judgment on the basis that it had eliminated part-time positions.

---

[12] Because a jury could find that Katz was full-time before her leave, I do not reach her argument that the clinic's asserted reason for denying her reinstatement was pretextual, based on the way the clinic treated other part-time employees. *See* [53] at 13–14.

16

Whether Northwest offered Katz a full-time position when she returned from leave is also a genuine dispute of material fact.[13] The parties offer competing versions of what occurred immediately before Katz's planned return to work. According to the clinic, the shareholders approved offering Katz the option of returning as either a full-time therapist or an independent contractor. Volanti and Roderick then met with Katz and gave her those two options. Katz responded that the clinic could hire two part-time therapists instead, which Volanti and Roderick took to mean that Katz wasn't interested in the full-time slot.

A reasonable jury could credit the clinic's account, as there is some evidence to corroborate it. For example, there are undisputed references to health insurance coverage in Volanti and Katz's communications, but since the independent contractor position did not come with health insurance, a factfinder could reasonably conclude that the subject of health insurance would not have come up unless full-time employment was on the table. And there is some record support for the clinic's assertion that Katz was not interested in working full-time, so she never offered to work full-time hours. Katz emailed Volanti and Roderick that she would need to work part-time hours at first. Katz did not reach out to any of the doctors to express an interest in full-time work. When Katz took another job at Athletico a few months later, she worked a part-time schedule, which a jury might find corroborates the clinic's assertion that Katz simply did not intend to work full-time.

---

[13] The clinic does not argue that an independent contractor position was an "equivalent" position to a part-time position, or that Katz was not entitled to reinstatement because the clinic had planned to fire her before her leave.

17

Katz, however, offers evidence contradicting the clinic's version of events. She says that when she met with Volanti and Roderick, they never offered her a full-time position. According to Katz, Roderick and Volanti said they had hired a full-time therapist to replace her, and she could come back only as an independent contractor. A reasonable jury could credit that account, too. In a follow-up email to Katz after the meeting, Volanti outlined the contours of an independent contractor role but did not mention the full-time position. Moreover, it is undisputed that the clinic's managers planned to fire Katz before they learned that her husband was sick, which a jury might find supports Katz's assertion that the clinic did not want her back full-time.

A reasonable jury could also infer that the clinic hired Bailey to avoid reinstating Katz. Northwest historically kept only one occupational therapist on staff, and did not anticipate any increase in demand in 2017 that would require two occupational therapists. When Bailey left the clinic, it functioned for several months without any occupational therapists at all. If the clinic could run without any full-time occupational therapists, a factfinder might doubt that the clinic planned to employ two when Katz returned. And the clinic never told Bailey about Katz, or Katz about Bailey, supporting Katz's suggestion that the clinic did not anticipate they would be working simultaneously.

The truth about whether Northwest offered Katz a full-time job—whether Northwest offered to reinstate her to an equivalent pre-leave position—is a credibility question for a jury to resolve. A court on summary judgment must refrain from "weighing the evidence or deciding which inferences to draw from the facts." *Shaffer*,

662 F.3d at 446; *see also Hackett v. City of S. Bend*, No. 19-2574, 2020 WL 1888759, at *2 (7th Cir. Apr. 16, 2020) ("In fact-intensive cases, credibility traps abound, and courts must be alert to avoid them."). When "competing reasonable inferences" can be drawn from the record, summary judgment is not appropriate. *Shaffer*, 662 F.3d at 445.

The clinic dismisses Katz's evidence as merely "self-serving" testimony. [49] at 32; [55] at 9, 11, 12. But affidavits and other written testimony "by their nature are self-serving." *Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013). A witness's self-interest "does not prevent a trier of fact from crediting a statement based on personal knowledge." *Koger v. Dart*, 950 F.3d 971, 974 (7th Cir. 2020). The term self-serving "must not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment." *Hill*, 724 F.3d at 967. Katz presents her side of the story, based on her personal knowledge. Defendants' rejoinder that the evidence is "self-serving" signals the weakness of their own argument for summary judgment.

Katz presents a genuine dispute of material fact about whether Northwest offered to reinstate her to her original job. Summary judgment on her reinstatement claim is denied.[14]

---

[14] For the first time in reply, the clinic argues that Katz was not entitled to reinstatement because she remained on leave after her husband died, when her FMLA coverage had expired. [55] at 4. Arguments made for the first time on reply are waived. *Gonzales v. Mize*, 565 F.3d 373, 382 (7th Cir. 2009). I also decline to consider it because the clinic cites no authority for the notion that Katz was not entitled to FMLA benefits because her leave outlasted her FMLA coverage period. "Arguments that are underdeveloped, cursory, and lack supporting authority are waived." *Shipley v. Chi. Bd. of Election Commissioners*, 947 F.3d 1056, 1063 (7th Cir. 2020).

2. *Individual Liability*

Northwest argues that summary judgment should be granted to the individual defendants on Katz's FMLA claim, and I agree.

Only an employer may be liable under the FMLA. The statute defines "employer" as "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer." 29 U.S.C. § 2611(4)(A)(ii)(I); *see also* 29 C.F.R. § 825.104(d). Individuals may be liable under the FMLA. *See Horwitz v. Bd. of Educ. of Avoca Sch. Dist. No. 37*, 260 F.3d 602, 610 n.2 (7th Cir. 2001); *see also Eppinger v. Caterpillar Inc.*, 682 Fed. App'x 479, 481 (7th Cir. 2017) (noting that the FMLA's definition of employer "encompasses some individual liability").

The Seventh Circuit has not supplied a test for assessing individual liability under the FMLA. But under the Fair Labor Standards Act, an individual may be liable as an employer if that individual "had supervisory authority over the complaining employee and was responsible in whole or part for the alleged violation." *Riordan v. Kempiners*, 831 F.2d 690, 694 (7th Cir. 1987). The FLSA's definition of "employer" is "materially identical" to the FMLA's definition. *Haybarger v. Lawrence Cty. Adult Prob. & Parole*, 667 F.3d 408, 414 (3d Cir. 2012) (citation omitted). The FLSA defines employer to include "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d); *see Luder v. Endicott*, 253 F.3d 1020, 1022 (7th Cir. 2001). Because the statutes define employer the same way, courts in this district analyze individual liability under the FMLA using the *Riordan* test. *See Freemon v. Foley*, 911 F.Supp. 326, 331 (N.D. Ill. 1995);

*see also Ruckebeil v. Cancer Treatment Ctrs. of Am., Inc.*, No. 15 C 08259, 2016 WL 878585, at *2 (N.D. Ill. Mar. 8, 2016); *Austin v. Cook Cty.*, No. 07 C 3184, 2009 WL 799488, at *3 (N.D. Ill. Mar. 25, 2009).

The circuits with a test for individual liability under the FMLA use an "economic reality" test. *See Graziadio v. Culinary Inst. Of Am.*, 817 F.3d 415, 422 (2d Cir. 2016) (collecting cases). The test asks whether the employer possessed "the power to control" the worker, with an emphasis on the economic reality of the employment situation. *Id.* Factors to consider under the economic-reality test include whether the individual had the power to hire and fire the employee, supervised and controlled the employee's work schedule or conditions of employment, determined the rate and method of payment, maintained employment records, and whether the employer controlled the employee's rights under the FMLA. *Graziadio*, 817 F.3d at 422. The Seventh Circuit uses a similar analysis when considering who is a joint employer under both the FMLA and FLSA. *See Moldenhauer*, 536 F.3d at 644 (for an employment relationship to exist, "each alleged employer must exercise control over the working conditions of the employee"); *see also Simpkins v. DuPage Hous. Auth.*, 893 F.3d 962, 964 (7th Cir. 2018) (coverage under the FLSA depends on the economic reality of the working relationship between the employee and employer).

Against that backdrop, the question here is whether a reasonable jury could find that any individual defendant exerted sufficient control over Katz's conditions of employment—including her FMLA leave and return—such that he or she may be individually liable for the alleged FMLA violation. Beginning with the physicians, it

21

is undisputed that Northwest made decisions about clinic business as a collective entity. The physician shareholders all had equal votes and voted as a group to hire new employees, fire old ones, and approve changes in employees' compensation or benefits. Katz has presented no evidence that any individual doctor could unilaterally hire or fire a Northwest employee, approve a raise, promotion, or demotion, or change an employee's hours or employment status. Katz does not dispute that she did not report to the individual physicians. And she did not discuss the terms of her FMLA leave with any of them. Other than Brian McCall, none of the doctors even spoke to Katz while she was on leave, let alone about the conditions of her return. And she points to no evidence that any of the individual doctors had the authority to personally decide that she be replaced by Bailey or denied a full-time position upon her return. The doctors decided to hire Bailey as a group at the September 18 shareholders' meeting, the same meeting at which they decided, as an entity, that Katz could return as a full-time employee or independent contractor, but not as a part-time employee. No reasonable jury could find that any one of the individual doctors were Katz's "employer" under the FMLA.

Likewise, Volanti's role was to implement the decisions the doctors made. Although she made recommendations to them, it was the doctors who had the decisionmaking power (collectively). For example, when Katz requested a raise before her leave, Volanti took that request to the shareholders. The shareholders decided as a group to terminate Katz instead. After Katz's leave of absence, when she asked to return to work and suggested certain hours, again, Volanti presented that request to

22

the shareholders. Volanti recommended hiring Bailey, but it was the shareholders who ultimately approved the hire and authorized Volanti to make the offer. Roderick had even less control—she did not even attend the shareholders' meetings. Katz has presented no evidence that any of the individual defendants had adequate control over her situation to qualify as an individual employer under the FMLA. Summary judgment is granted to all of the individual defendants on Katz's FMLA failure-to-reinstate claim.

### 3. Notice

Under the FMLA, when an employee notifies her employer that she intends to take leave, the employer must notify the employee if that leave qualifies as FMLA leave within five business days. *Lutes v. United Trailers, Inc.*, 950 F.3d 359, 365 (7th Cir. 2020) (citing 29 C.F.R. §§ 825.300(d), 825.301(a)). An employer's failure to notify the employee that her leaves qualifies as FMLA leave may be interference with the employee's FMLA rights "if it caused the employee to suffer harm." *Id*. Put differently, a violation of the FMLA is "not enough to establish injury"; the employee "must show [s]he was prejudiced" by the violation by showing that she "would have structured h[er] leave differently had [s]he received the proper information." *Id*. at 368.

There is some dispute about when Volanti and Roderick first mentioned the FMLA to Katz, but it is undisputed that the clinic did not provide a notice of eligibility within five business days as required. Katz cannot survive summary judgment on this claim, however, because she does not argue that she was prejudiced by Northwest's notification procedure, forfeiting any such argument. *See Nichols v.*

*Mich. City Plant Planning Dep't*, 755 F.3d 594, 600 (7th Cir. 2014) (nonmoving party forfeits arguments not raised in response to the moving party's motion for summary judgment). No reasonable jury could find that Katz suffered prejudice in any event. Katz was afforded the 12 weeks of leave she was entitled to (indeed, she received more than that in paid leave), and she offers no evidence about how she would have structured her leave differently if she had been notified or filled out the paperwork earlier.

Summary judgment is granted on Katz's notice theory.

### B. Breach of Contract

The employee handbook outlined the clinic's leave policy, mirroring the FMLA. It included that an employee was entitled to "job protection" after taking FMLA leave. Katz says this employee manual created a contract, which the clinic breached by not preserving Katz's job for her. (She brings this claim only against the clinic itself, not the individual defendants.) The clinic contends there is no dispute of material fact over whether it breached a contract because, as a matter of law, the employee manual did not create a contract. I agree with Northwest.

To prove her breach-of-contract claim under Illinois law, Katz must show: (1) the existence of a valid and enforceable contract; (2) substantial performance; (3) breach; and (4) damages. *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 886 (7th Cir. 2018). Contract formation is a question of law in Illinois. *Selch v. Columbia Mgmt.*, 2012 IL App (1st) 111434, ¶ 53.

Under Illinois law, employment relationships that are not for a fixed time are presumed to be at will. *Swyear*, 911 F.3d at 885; *A.T.N., Inc., v. McAirlaid's Vliesstoffe*

*GmbH & Co.*, 557 F.3d 483, 486 (7th Cir. 2009). An employee may overcome that presumption based on an employer's handbook or manual if the traditional elements of contract formation are present. *See Swyear*, 911 F.3d at 885; *Thomas v. Pearle Vision, Inc.*, 251 F.3d 1132, 1136 (7th Cir. 2001); *Duldulao v. St. Mary of Nazareth Hosp. Ctr.*, 115 Ill.2d 482, 490 (1987). To establish that an employee handbook created a valid contract, the employee must show: (1) the language of the policy statement contains a promise clear enough that an employee would reasonably believe that an offer has been made; (2) the statement was disseminated to the employee in such a manner that the employee was aware of its contents and reasonably believed it to be an offer; and (3) the employee accepted the offer by commencing or continuing to work after learning of the policy statement. *Duldulao*, 115 Ill.2d at 490.

When an employer manual "states expressly that it does not create contractual rights, there simply is no promise that an employee can reasonably interpret as an offer to be bound." *Sutula-Johnson v. Office Depot, Inc.*, 893 F.3d 967, 972 (7th Cir. 2018). If a disclaimer is "clear and forthright," the disclaimer "is a complete defense to a suit for breach of contract based on an employee handbook." *Workman v. United Parcel Serv., Inc.*, 234 F.3d 998, 1000 (7th Cir. 2000); *see also Ivory v. Specialized Assistance Servs., Inc.*, 365 Ill.App.3d 544, 546 (1st Dist. 2006) ("[W]here the employee manual contains a disclaimer indicating that the manual promises nothing and does not act as a contract, no enforceable contractual rights will be conferred on the employee based on that manual.").

The unambiguous disclaimers in the Northwest employee handbook defeat Katz's breach-of-contract claim. Katz never signed an employment agreement; the only contract she points to is Northwest's employee manual, which informed employees that they had "job protection" after FMLA leave. Katz says this was a promise sufficiently clear for her to consider it an offer, meeting the first element of contract formation by employee manual. But the handbook explicitly stated that the clinic reserved the right "to revise or terminate" any "policies, procedures or benefits in whole or in part with or without notice at any time." It also stated that all employment was at-will, and informed employees that the manual itself was not an employment contract. [51] ¶ 9. The same document contained those disclaimers and the FMLA policy that Katz says created a contract. Based on multiple, explicit disclaimers, Katz could not have reasonably believed that the handbook's mention of "job protection" was an offer. The handbook did not create a contract. *See Sutula-Johnson*, 893 F.3d at 972 (affirming summary judgment for employer on breach-of-contract claim where employer's policy said it "should not be thought of as a contract of employment other than at will" and employer could "amend or terminate the plan at any time for any reason without notice"); *Farr v. St. Francis Hosp. & Health Ctrs.*, 570 F.3d 829, 834 (7th Cir. 2009); *Dawson v. City of Geneseo*, 2018 IL App (3d) 170625, ¶ 19; *Ivory*, 365 Ill.App.3d at 546.

Since the employee handbook was not a contract, there was no contract for Northwest to breach and Katz cannot prevail on a breach-of-contract claim.

### C. Tortious Interference with Contract

Katz brings a claim of tortious interference with contract against all defendants. To prove tortious interference with contract, Katz must establish: (1) a valid contract; (2); defendants' knowledge of the contract; (3) defendants' intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach of contract caused by defendants' wrongful conduct; and (5) damages. *Webb v. Frawley*, 906 F.3d 569, 577 (7th Cir. 2018). For the reasons discussed above, there was no contract between Katz and Northwest for anyone to have interfered with. Moreover, Katz lists Northwest as a defendant. But Northwest was a party to the alleged contract, and a party cannot tortiously interfere with its own contract. *Koehler v. Packer Grp., Inc.*, 2016 IL App (1st) 142767, ¶ 43. Summary judgment is granted to all defendants on Katz's tortious-interference-with-contract claim.

### D. Promissory Estoppel

Promissory estoppel is an alternative means of obtaining contractual relief in Illinois. *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 566 (7th Cir. 2012). But promissory estoppel does not give a party a "second bite at the apple" if she cannot prove breach of contract. *Dumas v. Infinity Broad. Corp.*, 416 F.3d 671, 677 (7th Cir. 2005) (quoting *All-Tech Telecom, Inc. v. Amway Corp.*, 174 F.3d 862, 869–70 (7th Cir. 1999)). Under Illinois law, a plaintiff can recover for promissory estoppel under "certain narrow circumstances"; that is, only when all the other elements of a contract exist, but consideration is lacking. *Id.*

To prove promissory estoppel, Katz must show: (1) defendants made an unambiguous promise to her; (2) she relied on the promise; (3) that reliance was

expected and foreseeable by defendants; and (4) she relied on the promise to her detriment. *Firestone Fin. Corp. v. Meyer*, 796 F.3d 822, 827 (7th Cir. 2015); *Wigod*, 673 F.3d at 566. Reliance must be reasonable and justifiable. *BPI Energy Holdings, Inc. v. IEC (Montgomery), LLC*, 664 F.3d 131, 138 (7th Cir. 2011); *Quake Const., Inc. v. American Airlines, Inc.*, 141 Ill.2d 281, 309–10 (1990).

Katz says she says she relied to her detriment on the employee handbook, which assured employees of "job protection" following FMLA leave. And she contends that her managers reinforced that promise by telling her "to take whatever time she needed to care for her family" and by "never setting any return to work date or schedule restrictions." [53] at 20. Katz does not identify in her brief what specific statements she relied on or who made them. (She brings this claim against all defendants.) But Katz must be referring to the following statements offered in the parties' Local Rule 56.1 statements: When Volanti learned of Katz's husband's illness, Volanti told Katz to take the time off that she needed. [51] ¶ 20. When Katz asked Roderick about health insurance, Roderick responded, "we've got coverage through the holidays into the early part of the new year," and instructed Katz to "take time to be with your family." [56] ¶ 27. When Katz said she wanted to return to work in a month, Brian McCall responded something to the effect of, "Don't worry," and the work would be there for her when she returned. [51] ¶ 25; [56] ¶ 11. In her statement of additional facts, Katz asserts that, after her husband died, "They were telling me

in text messages, Stay home. Don't worry. Take your time. Stay off until January." [56] ¶ 11.[15]

No reasonable jury could find that those statements from McCall, Roderick, and Volanti were unambiguous promises of full-time employment.[16] Substantively, the statements did not address the hours or conditions of Katz's job upon her return, let alone offer any guarantees. Katz says she was promised that her job would be there for her when she returned, but no one made that promise to her. At best, McCall's statement that "the work" would be there when she returned could arguably be interpreted as an indication that Katz had a job to return to. But it was not a clear and concrete statement ensuring Katz a full-time job and health insurance— independent contractors do "the work" as well. *See Sembos v. Philips Components*, 376 F.3d 696, 704 (7th Cir. 2004) (promises of employment were "too indefinite, as a matter of law, to constitute unambiguous promises"); *Hozzian v. City of Chicago*, 585 F.Supp.2d 1034, 1040 (N.D. Ill. 2008) (employer's statement was "too vague … to be considered a promise of employment"); *see also Robinson v. BDO Seidman, LLP*, 367 Ill.App.3d 366, 372 (1st Dist. 2006) (plaintiff failed to sufficiently allege that defendant's promises were "unambiguous offers" of employment).

---

[15] Katz refers in her brief to a promise that her "job would be there for her." [53] at 8. She does not attribute this statement, but I infer that it refers to Brian McCall's statement. McCall told Katz that returning to work in a month would be fine, "and that the work would be there when she was ready." [50-1] at 50, ¶ 36.

[16] Katz brings her promissory-estoppel and IIED (discussed below) claims against all defendants, including Volanti, Roderick, and the physician shareholders. Because I find that there is no genuine dispute of material fact as to either of these claims, I do not reach the defendants' arguments about individual liability.

And no jury could find that reliance on either the employee handbook or those statements was reasonable, for the same reason that the handbook did not create a contractual duty: the document expressly stated that Katz's employment was at will, and Northwest could end their employment relationship or change the conditions of employment at any time for any reason. A "disclaimer that is effective against a claim of breach of contract is also effective … against a claim of promissory estoppel." *Workman*, 234 F.3d at 1001; *see Dawson*, 2018 IL App (3d) 170625, ¶ 20 ("Based upon the disclaimer that was contained in the Personnel Ordinance, plaintiff could not reasonably rely on any promises made in the ordinance."); *Ross v. May Co.*, 377 Ill.App.3d 387, 394 (1st Dist. 2007) (plaintiff's reliance on manager's promise of continued employment was unreasonable where employee handbook had "explicit disclaimer" that only one executive could alter at-will employment status). And disclaimers aside, no jury could find it reasonable to take generic expressions of compassion and sympathy—especially when made off the cuff at a memorial service— as guarantees of certain hours, benefits, or working conditions. *See Sembos*, 376 F.3d at 704–05 (where employer did not promise any "specific position, salary, or other terms of employment," it was unreasonable for plaintiff to rely on promise of employment).

Nor could a factfinder conclude that Katz relied to her detriment on either her supervisors' statements or the employee manual. Katz contends that, if not for her reliance on those statements, she would have offered to work full-time hours sooner, offered to return to work earlier, and started looking for a job earlier. But Katz does

not suggest that she would have returned to work before her husband's death, so the window of time in which she realistically would have acted differently amounts to only about a month. Katz's theory of the case is that the clinic withheld a full-time position because it had hired Bailey to replace her; but this theory does not advance a claim for detrimental reliance on Katz's part. The decision to hire Bailey was independent of Katz's return date. To be sure, that the clinic hired Bailey may ultimately contribute to proving an FMLA violation—but it was not the timing of Katz's return that caused that event. The plan was in motion before the clinic knew when Katz would return. Katz thus fails to establish that she lost something by relying on the alleged promises to take all the time she needed. Nor could a reasonable jury find that those statements prevented Katz from looking for a new job earlier, as she contends. Katz does not dispute that, although she received a job offer from Athletico in mid-December, she asked to begin in February, undermining her claim that she was left scrambling to find another job. *See Sembos*, 376 F.3d at 704–05 (granting summary judgment for employer where plaintiff failed to show that he detrimentally relied on employer's alleged promises).

No jury could find that it was reasonable for Katz to rely on an employee manual that contained disclaimers, or on statements of sympathy that contained no unambiguous promises about Katz's hours. Nor could a jury find that Katz relied on those promises to her detriment. Summary judgment is granted to all defendants on Katz's promissory-estoppel claim.

### E.    Intentional Infliction of Emotional Distress

Katz brings a claim of intentional infliction of emotional distress against all defendants. Under Illinois law, Katz must prove that: (1) the conduct was extreme and outrageous; (2) defendants intended their conduct to inflict severe emotional distress, or knew that there was a high probability that their conduct would inflict such distress; and (3) the conduct caused severe emotional distress. *Boston v. U.S. Steel Corp.*, 816 F.3d 455, 467 (7th Cir. 2016); *Bailey v. City of Chicago*, 779 F.3d 689, 696–97 (7th Cir. 2015). Mere "insults, indignities, threats, annoyances, petty oppressions, or other trivialities" do not amount to extreme and outrageous conduct. *Richards v. U.S. Steel*, 869 F.3d 557, 566–67 (7th Cir. 2017) (quoting *Van Stan v. Fancy Colours & Co.*, 125 F.3d 563, 567 (7th Cir. 1997)). The conduct must be "so outrageous in character" and "so extreme in degree" as to "go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Schweihs v. Chase Home Fin., LLC*, 2016 IL 120041, ¶ 51 (quoting Restatement (Second) of Torts § 46 cmt. D, at 73 (1965)); *see also Richards*, 869 F.3d at 566–67.

Several factors inform whether a defendant's conduct was outrageous. *Schweihs*, 2016 IL 120041, ¶¶ 51–52. Courts consider the intensity and duration of the emotional distress; whether the defendant abused some position that gave him authority over the plaintiff; and the reasonableness of the defendant's belief that his objective was legitimate. *Id.* Another factor courts consider is the defendant's awareness that the plaintiff is particularly susceptible to emotional distress, "because of some physical or mental condition or peculiarity." *Kolegas v. Heftel Broad. Corp.*,

32

154 Ill.2d 1, 21 (1992). Behavior that might otherwise be considered merely rude or abrasive may be outrageous "if the defendant knows that the plaintiff is particularly susceptible to emotional distress." *Id.*; *see also Dixon v. Cty. of Cook*, 819 F.3d 343, 351 (7th Cir. 2016). No factor alone is dispositive, and courts must consider the facts and circumstances of any particular case. *Schweihs*, 2016 IL 120041, ¶ 52; *see also Richards*, 869 F.3d at 567.

In Illinois, liability for emotional distress is particularly "constrained in the employment context." *Richards*, 869 F.3d at 567. That is because if employers could be held liable for emotional distress caused by "everyday job stresses," such as disciplinary actions, job transfers, or even terminations, "nearly every employee would have a cause of action." *Id.* (quoting *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 606 (7th Cir. 2006)). Thus, there is a "general hesitation" to find IIED in the workplace. *Id.* To that end, courts have found extreme and outrageous behavior only when an employer "clearly abuses the power it holds over an employee" in a way that goes beyond "typical disagreements or job-related stress." *Boston*, 816 F.3d at 467 (quoting *Honaker v. Smith*, 256 F.3d 477, 491 (7th Cir. 2001)).

No reasonable jury could find that Northwest's conduct was extreme and outrageous. The clinic's managers tried to accommodate and support Katz in a variety of ways, undermining an inference that the clinic intended to cause her emotional distress or acted with callous disregard toward her situation. They decided not to fire Katz when they found out her husband was ill. The clinic gave her more than 12 weeks of leave, and paid her throughout that time even after her PTO had run out.

No one ever set a mandatory return date for Katz to come back or pressured her to return.

Drawing all inferences in Katz's favor and assuming that the clinic surreptitiously replaced her while she was on leave, lulled her into complacency, then offered her only a contractor position when she returned, a jury could not find that conduct so atrocious that it was utterly intolerable in a civilized society. Katz was not fired. The clinic offered her a contract position, which was a position that it had offered to other employees as part of the restructure. Using a passive-aggressive technique to show an employee the door is poor management, but not uncivilized.

Courts must consider whether the defendants reasonably believed that their objectives were legitimate; "greater latitude is given to a defendant pursuing a reasonable objective even if that pursuit results in some amount of distress for a plaintiff." *Cairel v. Alderden*, 821 F.3d 823, 836 (7th Cir. 2016) (quoting *Honaker*, 256 F.3d at 491)). Katz says the clinic had no legitimate motives for hiring Gabel and Bailey. I disagree. It is undisputed that the shareholders had decided to terminate Katz in April, before it learned of her husband's illness. There was nothing illegitimate about hiring Gabel to replace her. And while there is some question about the necessity of hiring Bailey when the clinic says it expected Katz to return to work, under the totality of the circumstances, a jury could not find that action extreme and outrageous. Nor could a reasonable jury find that the clinic had illegitimate motives in offering Katz a contractor position. Katz had already told Volanti and Roderick in an email that she could not work full-time hours when she returned. The clinic had

34

restructured over the summer and eliminated all part-time employees, in a move unrelated to Katz personally.

True, as Katz points out, the clinic's managers were in a position of authority over her. But so is every employer. That is why IIED is generally disfavored in the employment context. Katz describes nothing so outside the bounds of a routine employment decision that would allow a jury to conclude the clinic was abusing its position of authority—nor was it even atypical for Northwest to offer independent contractor hours to its employees, as at least two other employees transitioned into independent contractors around the same time.

Katz argues that the clinic's behavior was egregious because the clinic's managers knew that she had just experienced a personal tragedy, so she was particularly susceptible to emotional distress. But vulnerability is this context is typically caused by "some physical or mental condition or peculiarity." *Kolegas*, 154 Ill.2d at 21; *see McGrath v. Fahey*, 126 Ill.2d 78, 92 (1988) (a jury could find extreme and outrageous conduct where defendants had reasons to believe that the plaintiff might be susceptible to heart disease); *Pavilon v. Kaferly*, 204 Ill.App.3d 235, 246–47 (1st. Dist. 1990) (that defendant knew plaintiff was undergoing psychotherapy was a "significant factor" in evaluating outrageousness of conduct). Katz offers no evidence that she suffered from a physical or mental condition rendering her particularly vulnerable. And she does not dispute that she has never been diagnosed with a psychiatric or psychological condition. She asserts that she became depressed and anxious as a result of parting ways with Northwest after her husband died, but there

is no evidence that she suffered from those conditions earlier, while Northwest was making decisions about her return. Nor is there evidence that anyone at Northwest knew that Katz suffered from a medical condition that made her particularly vulnerable. The clinic knew that Katz had experienced a personal tragedy, and it is reasonable to infer that she would be particularly sensitive as a result. But vulnerability from a recent death is typically insufficient to show a particular susceptibility to distress for purposes of an IIED claim. *See Mogul v. SCI Ill. Servs. Inc.*, 2019 IL App (1st) 182690-U, ¶ 49, *appeal denied*, 135 N.E.3d 580 (Ill. 2019) (defendant's knowledge that plaintiffs' mother had recently died was insufficient to show they were particularly susceptible to emotional distress); *see also Maclin v. A.M. Bus Co.*, No. 04 C 4176, 2006 WL 463370, at *18 (N.D. Ill. Feb. 22, 2006) (same, where employee was both pregnant and "going through a difficult time" due to a recent death). And any emotional vulnerability here is not enough, given the lack of outrageous conduct in the employment context, to create a factual issue.

Because no reasonable jury could find that the clinic's conduct was extreme and outrageous, summary judgment is granted to all defendants on Katz's intentional-infliction-of-emotional-distress claim.

## F. Fraudulent Misrepresentation

Katz alleges that the clinic, Roderick, Volanti, and Brian McCall made fraudulent statements and omissions that she relied on to her detriment. For this claim, she relies on the same statements as she did for her promissory-estoppel claim—her managers' instructions not to worry about work and take off as much time as she needed. She also argues that the defendants intentionally withheld news of

the clinic's restructure and Bailey's appointment. Katz claims the clinic meant to trick her into believing her job was secure, in an attempt to execute a plan to fire her, which the clinic had delayed from earlier in the year.

To prove fraudulent misrepresentation in Illinois, Katz must prove that: (1) Roderick, Volanti, and Brian McCall made false statements or omissions of material fact; (2) they did so knowing or believing the statements to be false; (3) they made the statements with the intent to induce Katz to act; (4) Katz acted in justifiable reliance on the truth of those statements; and (5) Katz suffered damage as a result of her reliance on those statements. *Integrated Genomics, Inc. v. Gerngross*, 636 F.3d 853, 863 (7th Cir. 2011); *Johnson v. Waterfront Servs. Co.*, 391 Ill.App.3d 985, 992–93 (5th Dist. 2009). Whether reliance is justified must be considered in light of the surrounding circumstances, including what the plaintiff knew and what she could have learned through the exercise of ordinary prudence. *Johnson*, 391 Ill.App.3d at 993.

In addition to the elements for fraudulent misrepresentation, a plaintiff alleging fraudulent omission or concealment must show that the defendant concealed a material fact "when he was under a duty to disclose that fact to plaintiff." *Toulon v. Cont'l Cas. Co.*, 877 F.3d 725, 737 (7th Cir. 2017) (quoting *Connick v. Suzuki Motor Co.*, 174 Ill.2d 482, 500 (1996)); *Lidecker v. Kendall Coll.*, 194 Ill.App.3d 309, 317 (1st Dist. 1990). A duty to disclose may be based on a fiduciary relationship, or a relationship of trust and confidence where the defendant is in a "position of influence and superiority over plaintiff." *Toulon*, 877 F.3d at 737 (quoting *Connick*, 174 Ill.2d

37

at 500). A "special trust" relationship is "extremely similar to that of a fiduciary relationship," and Illinois courts "rarely" find a special-trust relationship to exist without a fiduciary relationship. *Id.* at 738 (quoting *Wigod*, 673 F.3d at 571). The defendant must exercise "overwhelming influence" over the plaintiff to establish a special-trust relationship. *Id.* (quoting *Wigod*, 673 F.3d at 572–73). A duty to disclose may also arise if a defendant tells a half-truth and "then becomes obligated to tell the full truth." *Id.* at 737.

No reasonable jury could find that Northwest had a duty to disclose to Katz that it had restructured the clinic or hired another therapist. Katz does not rest on a fiduciary relationship—nor could she, as the existence of an employer-employee relationship, without more, does not create a fiduciary duty. *Vargas v. Esquire, Inc.*, 166 F.2d 651, 653–54 (7th Cir. 1948) (employee-employer relationship "is not sufficient" to establish fiduciary relationship); *see Hess v. Kanoski & Assocs.*, 668 F.3d 446, 455 (7th Cir. 2012); *Smith v. Kelly*, 2018 IL App (3d) 170251-U, ¶¶ 15–16, *appeal denied*, 108 N.E.3d 800 (Ill. 2018); *Gross v. Univ. of Chicago*, 14 Ill.App.3d 326, 339 (1st Dist. 1973).

Katz instead points to her longstanding employment and close relationship with Northwest. But no reasonable jury could find that a "special trust" existed between Katz and the clinic. Katz describes a routine employer-employee relationship in a small office setting. While the doctors testified that they generally had a friendly relationship with Katz, they had also decided to fire her just a few months earlier, negating any suggestion that there was some special bond between them or that the

clinic held "overwhelming" influence over Katz beyond that of a usual employer. True, the clinic held some degree of influence over Katz because it employed her—but the same is true of any employer over any employee. Under Katz's logic, an employer would have a duty to disclose all managerial and hiring decisions to any employee whom it had employed for some length of time. The defendants did not have a special duty to disclose to Katz that they had hired someone or restructured the clinic.

That leaves the statements. No reasonable jury could find that McCall, Volanti, or Roderick made any false statements of material fact. First, the statements Katz identifies were not statements of fact. They were expressions of sympathy and assurances not to worry about work. At best, those expressions could be considered an implicit promise that Katz's job would be waiting for her, as Katz says. But promises are not actionable for a fraud claim. That is, "assurances as to future events are generally not considered misrepresentations of fact." *Power v. Smith*, 337 Ill.App.3d 827, 832–33 (4th Dist. 2003); *see also LaScola v. U.S. Sprint Commc'ns*, 946 F.2d 559, 568 (7th Cir. 1991) (upholding summary judgment on fraudulent-misrepresentation claim where the representations made to plaintiff "were promises or opinions, not material facts"). So any implicit promise that Katz's job would remain unchanged in the future cannot sustain her fraud claim.

Drawing all inferences in Katz's favor, and assuming that a jury could find that the statements at issue were concrete assurances that Katz's exact job was waiting for her, Katz's claim nevertheless cannot survive summary judgment. Katz presents no evidence that the defendants intentionally misled her. The clinic had nothing to

gain by lulling Katz into a false sense of security that she could return to her original job. No jury could find that the defendants were trying to trick Katz into staying out of work longer—they had no reason to do so. *See LaScola*, 946 F.2d at 569 (upholding summary judgment on fraudulent-misrepresentation claim where defendant's statements "were not meant to cause [the plaintiff] to affirmatively act"). Katz speculates that the clinic had put its plan to fire her on hold, so the defendants lied to her as part of their scheme to force her out of the clinic. But even if true, Katz does not explain how the alleged false statements furthered that objective; the statements did not improve the clinic's ability to eliminate Katz's job.

The final two elements of fraud—that Katz justifiably relied on the false statements and that she suffered damages as a result—are "similar to the third and fourth elements of promissory estoppel." *Newton Tractor Sales, Inc. v. Kubota Tractor Corp.*, 233 Ill.2d 46, 60 (2009). For the reasons discussed above, no jury could find that Katz reasonably relied on those statements to her detriment. As in the context of her promissory-estoppel claim, it was unreasonable for Katz to ascribe a job guarantee to them, especially given the employee handbook's explicit disclaimer that the clinic could change an employee's job conditions or benefits at any time. And Katz fails to show that, had she returned to work earlier, the clinic would have offered her a full-time job. *See Squires-Cannon v. Forest Pres. Dist. of Cook Cty.*, 897 F.3d 797, 806 (7th Cir. 2018) (dismissing fraudulent-misrepresentation claim where, even if statements were fraudulent, plaintiffs "fail[ed] to allege any plausible damage").

Katz fails to marshal evidence creating a genuine dispute of material fact that the defendants intentionally defrauded her by either their statements or their omissions. Summary judgment is granted to the clinic, McCall, Volanti, and Roderick.

## IV. Conclusion

Northwest's motion for summary judgment [48] is denied on Katz's FMLA interference claim, under the theory that Northwest violated her right to be reinstated, as to the clinic only. Summary judgment is granted as to all other claims. The clerk shall correct the docket to reflect that Northwest is the only remaining defendant. The parties shall file a status report by May 11, 2020, with their suggestions for a trial date and any requests for a referral to the magistrate judge to conduct a settlement conference.

ENTER:

Manish S. Shah
United States District Judge

Date: April 27, 2020